**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **ALEX GONZALES, SR.,**<br>Individually and as "Next Friend" to<br>minor child Z.A.G. and<br>**ELIZABETH HERRERA**<br>(aka Elizabeth Gonzales),<br>Individually and as "Next Friend" to<br>minor child Z.A.G., | § § § § § § § § | |
| *Plaintiffs*,<br>v. | § § § | **Case No. 1:23-cv-00009-RP**<br><br>**JURY TRIAL REQUESTED** |
| **LUIS SERRATO**, and<br>**GABRIEL GUTIERREZ**, | § § § § | |
| *Defendants*. | § § § § | |

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

To the Honorable Court:

1.      This is a lawsuit about Austin police officers Luis Serrato and Gabriel Gutierrez who fatally shot Alex Gonzales, Jr. ("Alex") on January 5, 2021, wrongfully and in violation of Alex's civil rights.

2.      Alex's parents, Alex Gonzales, Sr. and Elizabeth Herrera (a/k/a Elizabeth Gonzales) (collectively "Plaintiffs") bring this lawsuit to vindicate their son's civil rights and to hold the responsible parties accountable. Each Plaintiff asserts claims in his or her individual capacity as a wrongful death beneficiary of Alex Gonzales Jr. under Texas law. Each Plaintiff also asserts claims as "Next Friend" on behalf of minor child Z.A.G., who also is a wrongful death beneficiary of Alex Gonzales, Jr. under Texas law.

1

# I. PARTIES

3.      Plaintiff Alex Gonzales, Sr. is a citizen of Texas and a resident of Bastrop County, Texas. His son, Alex Gonzales, Jr, also was from Bastrop County, Texas. As Alex Gonzales, Jr.'s biological father, Plaintiff Alex Gonzales, Sr. is a wrongful death beneficiary and, as such, brings this wrongful death action in his individual capacity pursuant to Texas Civil Practice and Remedies Code §§71.002(b), 71.004(b) and 42 U.S.C. §§1983, 1988.

4.      Plaintiff Elizabeth Herrera (a/k/a Elizabeth Gonzales) is a citizen of Texas and a resident of Bastrop County, Texas. Her son, Alex Gonzales, Jr, also was from Bastrop County, Texas. As Alex Gonzales, Jr.'s biological mother, Plaintiff Elizabeth Herrera is a wrongful death beneficiary and, as such, brings this wrongful death action in her individual capacity pursuant to Texas Civil Practice and Remedies Code §§71.002(b), 71.004(b) and 42 U.S.C. §§1983, 1988.

5.      Minor child Z.A.G. ("Z.A.G.") is a person under the age of eighteen (18) who is a citizen of Texas and, on information and belief, is a resident of Travis County, Texas. As the presumed biological child of Alex Gonzales, Jr., Z.A.G. is a wrongful death beneficiary pursuant to Texas Civil Practice and Remedies Code §71.004(b). Each Plaintiff has standing to assert wrongful death claims on behalf of Z.A.G. pursuant to Texas Civil Practice and Remedies Code §71.004(b). Each Plaintiff asserts claims on behalf of Z.A.G. in his or her capacity as "Next Friend" of Z.A.G. pursuant to Texas Civil Practice and Remedies Code §§71.002(b), 71.004(b) and 42 U.S.C. §§1983, 1988. Z.A.G. is a necessary party to this action because, under Texas law, the claims of all potential wrongful death beneficiaries must be joined in a single action.[1]

---

[1] *See Ordonez v. Abraham*, 545 S.W.3d 655, 667 (Tex. App. – El Paso 2017) ("Texas undoubtedly requires that only one suit be filed to address the alleged negligent death of a person."); *Avila v. St. Luke's Lutheran Hosp.*, 948 S.W.2d 841, 850 (Tex. App. – San Antonio 1997) ("The [wrongful death] act contemplates that only one suit shall be brought, which shall be for the benefit of all parties entitled to recover.").

6.     Defendant Gabriel Gutierrez ("Gutierrez") was, at all relevant times, a police officer with the Austin Police Department, and Plaintiffs sue him in his individual capacity for compensatory and punitive damages for the death of Alex Gonzales, Jr. On information and belief, Defendant Gutierrez is a resident of Travis County, Texas. Defendant Gutierrez may be served with process at 715 E. 8th Street, Austin, Texas, 78701.

7.     Defendant Luis Serrato ("Serrato") was, at all relevant times, a police officer with the Austin Police Department, and Plaintiffs sue him in his individual capacity for compensatory and punitive damages for the death of Alex Gonzales, Jr. On information and belief, Defendant Serrato is a resident of Travis County, Texas. Defendant Serrato may be served with process at 715 E. 8th Street, Austin, Texas, 78701.

## II.     JURISDICTION AND VENUE

8.     Plaintiffs bring this case under 42 U.S.C. § 1983, and this Court has federal question subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

9.     This Court has general personal jurisdiction over each Defendant because, on information and belief, each Defendant resides in the Western District of Texas, Austin Division.

10.     This Court has specific *in personam* jurisdiction over each Defendant because this case arises out of conduct by each Defendant that occurred in Travis County, Texas, which is within the Western District of Texas, Austin Division.

11.     Venue for this case and the asserted causes of action is proper in the Western District of Texas, Austin Division pursuant to 28 U.S.C. § 1391(b) because all or a substantial portion of the events or omissions giving rise to each Plaintiff's claims occurred in the Western District of Texas, Austin Division.

# III. FACTUAL ALLEGATIONS

**A. Officer Gutierrez Used Excessive Force When He Shot and Mortally Wounded Alex Gonzales, Jr. Without Provocation or Justification.**

12.     In the early morning hours of January 5, 2021, minutes past midnight, Alex Gonzales, Jr. ("Alex") was driving his family home for the night. In the vehicle with Alex was his long-time girlfriend and partner Jessica Arellano ("Jessica"), who sat in the front passenger seat. In the back seat of Alex's car was Alex and Jessica's two-month-old infant, Z.A.G., who was safely secured and sleeping in a child restraining seat located in the back seat of the car, on the right-hand side just inches behind his mother Jessica in the front passenger seat. Alex and Jessica were on their way home to tuck in baby Z.A.G. to sleep for the night.

13.     As Alex and his family drove on or near Oltorf Avenue in Austin, Texas, Alex first encountered Defendant Gabriel Gutierrez ("Gutierrez") as Gutierrez was driving in the same direction as Alex's car.

14.     Gutierrez was (and remains) a licensed peace officer in the State of Texas and a patrol officer for the Austin Police Department. At the time Gutierrez first encountered Alex's car on the roadway that night, Gutierrez was off duty. Gutierrez was dressed in civilian workout clothes following a late-night workout at his personal gym. Gutierrez was driving his personal, unmarked car.

15.     On information and belief, Gutierrez was returning home to his apartment following a workout at his gym when he first encountered Alex's car on the road. On information and belief, Gutierrez was driving in a reckless and dangerous manner when he first encountered Alex's car. On information and belief, Gutierrez was responsible for creating and causing what Gutierrez would later describe to the 911 operator as a "road rage" encounter with Alex. On information and belief, Gutierrez drove his vehicle to make a sudden and unexpected turn in front

of Alex's car ("cutting off" Alex's car) as Gutierrez sped home from the gym. On information and belief, Gutierrez's aggressive and reckless driving as he encountered Alex's vehicle presented a real and substantial risk of causing a collision between the vehicles. On information and belief, Gutierrez's driving in his encounter with Alex's car posed a real and substantial danger to the physical safety of each passenger in Alex's car (including baby Z.A.G.), including risks of severe physical injury or even death to the passengers of Alex's car.

16.     After Gutierrez cut off Alex's car, Gutierrez subsequently turned from E. Oltorf Street and headed southwest on Wickersham Lane. Alex followed behind Gutierrez, also turning from E. Oltorf Street onto Wickersham Lane.

17.     Gutierrez's apartment was located on Wickersham Lane, with the apartment complex entrance located on the left side of the road to both Gutierrez and Alex as they each drove southwest on Wickersham. Gutierrez slowed his car as he approached the turn-in for his apartment complex on the left. But rather than attempting to turn left into his apartment complex, Gutierrez slowly pulled his car to the right-side curb and stopped his vehicle.

18.     Gutierrez's driving actions were intended to invite or encourage Alex to pull up his car alongside Gutierrez's car. Gutierrez's driving actions signaled to Alex that Gutierrez was inviting a "road rage" confrontation between the drivers. Because of Gutierrez's own aggressive driving and provocation toward Alex's car, Gutierrez knew at that moment that Alex was likely to be angry when he pulled up next to Gutierrez, and would be likely to use aggressive words or actions in such a "road rage" confrontation. On information and belief, Gutierrez already had his firearm drawn and he was already contemplating scenarios in which he might use lethal force against the approaching driver even before Alex pulled his car up next to Gutierrez.

19.     As Gutierrez pulled to the right and stopped, Alex pulled his vehicle forward until

it was alongside the left of Gutierrez's vehicle, where Alex stopped his vehicle.

20.     Alex did not use his vehicle to "cut off" Gutierrez from making a left hand turn into the apartment complex. Gutierrez did not attempt to turn into the apartment complex at that time. Gutierrez slowed and pulled to the right, allowing Alex to pull up next to him on Gutierrez's left. At no time did Alex's driving present a risk of causing a collision with Gutierrez. At no time was Gutierrez required to alter his own driving in order to avert a collision with Alex's vehicle.

21.     Jessica sat upright and was fully visible in the front passenger seat of Alex's car. When Alex stopped his car next to Gutierrez, Jessica was positioned in between the two men, Alex and Gutierrez. Jessica was sitting, clearly visible, no more than a few feet or less from Gutierrez as he sat in the driver's seat of his own car. Baby Z.A.G. was in the back, mere feet or inches behind Jessica.

22.     Alex pulled up next to Gutierrez's car with the intention of confronting Gutierrez about his aggressive driving. Alex intended to inform Gutierrez that there was a baby in the back seat of the car. Alex intended to have an important "man-to-man" with this unknown civilian, this crazy aggressive road rage driver who almost crashed into a family with a baby in the back seat.

23.     Gutierrez did not show his police badge or in any other way identify himself as a police officer before he made his decision to use lethal force. Gutierrez was wearing civilian clothes and driving an unmarked car at that moment. Alex and Jessica did not know (and had no reason to know) that Gutierrez was an APD patrol officer. Gutierrez did not issue any verbal commands for compliance directed at either Alex or Jessica before his decision to use lethal force. Gutierrez did not announce or attempt any arrest or detention before his decision to use lethal force.

24.     Less than three seconds after Alex pulled his car up next to Gutierrez's car, a

barrage of gunfire erupted from Gutierrez's car, directing lethal force at Alex and Jessica through the car windows. Gutierrez fires his weapon at least six times. At least one bullet fired by Gutierrez hit Alex in the head, and at least three bullets fired by Gutierrez hit Jessica in the arm, back and chest. Immediately, both Alex and Jessica were severely wounded and began bleeding profusely.

25. Even though Gutierrez was off-duty at the time, Gutierrez's use of lethal force directed at Alex was undertaken as a law enforcement action by Gutierrez on Alex.

26. No gunfire or lethal force was ever directed at Gutierrez. Alex never fired a weapon at Gutierrez or anyone else. Jessica never fired a weapon at Gutierrez or anyone else. Even after Gutierrez began firing multiple bullets at Alex and Jessica, there was no return gunfire directed at Gutierrez.

27. Alex did not pull up to Gutierrez's car with a gun pointed at Gutierrez. Gutierrez's statements to the contrary are false.

28. On information and belief, Alex did not point a gun directly at Gutierrez at any time. On information and belief, Alex did not brandish a gun in a threatening manner toward Gutierrez at any time. On information and belief, Alex did nothing whatsoever toward Gutierrez that would have caused Gutierrez to form a reasonable belief that Alex posed any risk of inflicting immediate physical harm to Gutierrez or anyone else. On information and belief, after Gutierrez started firing his weapon Alex attempted to retrieve a handgun from underneath his seat, but Alex was unable to retrieve his firearm in time to defend himself because Gutierrez opened fire so quickly, and because Gutierrez so quickly and immediately shot Alex in the head.

29. On information and belief, Alex's attempts to retrieve his firearm to defend himself after Gutierrez started shooting were legally valid acts of self-defense and/or defense of others.

30. Gutierrez was off-duty at the time he shot Alex and Jessica. Gutierrez did not

witness or observe anything, or have any other information, that would justify his decision to take law enforcement actions with respect to Alex or Jessica while Gutierrez was off-duty. Gutierrez did not witness a completed crime or a crime in progress. Gutierrez had no reason to believe that Alex or Jessica posed any immediate risk of physical danger or harm to Gutierrez or anyone else. No reasonable off-duty officer at the time, given the totality of facts and circumstances, would have made the decision that Gutierrez made to take law enforcement actions against Alex and Jessica by directing lethal force at them.

31.     Gutierrez decided to use lethal force in disregard of the safety of bystanders Jessica and baby Z.A.G. In particular, Jessica sat upright and clearly visible in the front passenger seat. Gutierrez, a patrol officer highly trained in situational awareness and tactical use of firearms in lethal force situations, shot her *three times* at close range. No reasonable officer under the circumstances would have made the same decision as Gutierrez to use lethal force, given the substantial risk of severe physical injury or death to Jessica, who was directly in Gutierrez's line of fire at close range.

32.     On information and belief, at the time of the shooting Gutierrez was in a physical and/or mental condition where he lacked the ability to accurately perceive and/or mentally process the events as they actually occurred that evening. On information and belief, Gutierrez caused himself to be in such a physical and/or mental condition by ingesting or consuming substances or compounds that altered his natural physical and/or mental conditions and abilities.

33.     Gutierrez had reasonable alternatives available to him other than the use of lethal force. For example, Gutierrez could have simply pulled his car forward and immediately ended the face-to-face confrontation. Gutierrez also could have pursued other methods of deescalating the situation, such as identifying himself as a police officer and issuing verbal commands to Alex

and Jessica. But Gutierrez instead chose to immediately use lethal force, with no efforts to deescalate or use alternatives to lethal force. Gutierrez's failure to pursue de-escalation or alternatives to lethal force was unreasonable. No reasonable officer under the circumstances would have chosen to use lethal force directed at Alex and Jessica given the available alternatives to the use of lethal force.

**B.     Gutierrez Calls 911 and Makes Materially False Statements to the 911 Operator.**

34.     In an instant that night, Alex had gone from driving along a city street with his girlfriend and baby to having the macabre experience of a stranger shooting repeatedly into his car with a semi-automatic handgun. As the events unfolded, Alex knew only that he had been shot in the head and that Jessica had been shot multiple times. At the moment Gutierrez ended his barrage of gunfire, Alex did not know whether his infant son Z.A.G. in the back seat had been shot, injured, or perhaps even killed.

35.     Almost immediately after Gutierrez stopped shooting, Alex's vehicle rolled slowly forward and up onto the right-hand curb, until it stopped a short distance ahead of Gutierrez's vehicle. Alex's car stopped when it ran into the curb. Jessica opened the passenger-side door and almost immediately fell to the ground, continuing to bleed profusely from the gunshot wounds inflicted by Gutierrez.

36.     Gutierrez's car followed Alex's car a short distance and then stopped several feet behind Alex's car. Gutierrez then exited his own vehicle with his gun drawn and pointed in the direction of Alex's car, with Alex and baby Z.A.G. still inside the car and Jessica laying injured and bleeding on the ground beside Alex's car. Gutierrez would keep his gun pointed at Alex and in the direction of Alex's car for at least the next several minutes.

37.     At approximately 12:33 AM, after having fired at least six shots into Alex's vehicle

and hitting both Alex and Jessica, Gutierrez called 911.

38.     Gutierrez began his call to 911 by identifying himself to the 911 operator as an off-duty APD officer. Gutierrez then stated "I have shots fired. 2400 Wickersham Lane."

39.     When the 911 operator next asked Gutierrez how many shots he had heard, Gutierrez responded by informing the 911 operator that a "victim" had been shot. Gutierrez stated: "I have a— a victim—the driver—the, uh, other vehicle, he has a gun. I'm not—I'm not shot. I need EMS over here."

40.     Seconds later, Gutierrez can be heard shouting at Alex "Hey, drop your gun. Austin Police." Gutierrez then states to the 911 operator: "He's got a gun in his hand." Gutierrez's statement was false when it was made. At the time Gutierrez made this statement to the 911 operator, Alex did not have a gun in his hand.

41.     Seconds later, Gutierrez again states to the 911 operator: "I'm APD, I—he's got a gun in his hand." Again, Gutierrez's statement was false when it was made. At the time Gutierrez made this statement to the 911 operator, Alex did not have a gun in his hand.

42.     Seconds later, Gutierrez can be heard yelling at Alex: "Put your gun down, man. Let me see your hands. Hands up, man." Again, this statement was false because at the time Alex did not have a gun in his hand.

43.     Gutierrez next stated to the 911 operator: "He's hanging out the door. He *had* a gun in his hand." (Emphasis added) Gutierrez next stated to 911 dispatch: "There's a passenger. She's lying on the ground—female passenger."

44.     The 911 operator then asked: "Okay, so tell me exactly what happened." Gutierrez responded by stating: "Um, it was a road rage incident. I was driving and he cut me off, and he pointed a gun at me." Gutierrez's account of the events to the 911 operator was false. Alex had not

used his vehicle to "cut off" Gutierrez; and Alex had not pointed a gun at Gutierrez.

45.    The 911 operator next asked if anyone was injured, and Gutierrez responded by saying "Yes, the—the driver of the other vehicle. He's shot." Later in the call, Gutierrez would tell the 911 operator that he was unsure whether the female on the ground (Jessica) had been shot or injured. During the entirety of the 911 call, Gutierrez failed to inform the 911 operator that the female on the ground had been shot, even though he personally had shot Jessica three times at close range just moments before.

46.    Gutierrez can next be heard yelling at Alex: "Put your gun down. Austin police, put your gun down. Don't make me shoot you again, man." Again, this statement was false because Alex did not have a gun in his hand at the time. Moments later, Gutierrez told the 911 operator: "The driver, he's standing. He's got blood all over his face. He's standing. *I don't know if he's still got the gun in his hand or not*." (Emphasis added).

47.    Near the very end of the 911 call, Gutierrez can be heard yelling at Alex: "All right, put your gun down, man. It's the police." Again, this statement was false when made because Alex did not have a gun in his hand at the time.

48.    During the 911 call, Gutierrez informed the 911 operator that the female on the ground was saying "My baby! My baby! My baby!" When the 911 operator asked "Is there a baby involved or is she pregnant? Do we not know?" Gutierrez responded by saying: "I have no idea, I don't know—I have no idea. She's just saying, 'My baby.'"

49.    During the 911 call, Alex was severely wounded and bleeding profusely because he had been shot in the head at close range by Gutierrez,. The gunshot wound to Alex's head severely compromised Alex's physical and mental functions, and his comprehension. Alex's physical movements were slow and lumbering. After being shot in the head, Alex was physically

incapable of making quick, sudden, or unexpected physical movements. Because of Alex's bleeding and lumbering movements, his severe physical injuries and need for immediate medical attention were clearly apparent to any reasonable person and to any reasonable trained law enforcement officer.

50.     During the time Gutierrez was on the phone with the 911 operator, Alex opened his car door and slowly exited the vehicle. Because of his severe injuries and physical limitations from being shot, Alex struggle to open his car door, but eventually he managed to open his car door and slowly exit his vehicle. Alex then stood nearly motionless beside his driver-side car door for several minutes. Alex remained in this spot next to the driver-side car door, without making any sudden or unexpected movements, and struggling to remain standing, for the duration of Gutierrez's 911 call and until on-duty police officers arrived at the scene. During this time before on-duty officers arrived, as Alex stood outside his car, Alex never held a gun in his hand.

51.     Gutierrez finally, for the first time, identified himself as a police officer by yelling at Alex and Jessica while Gutierrez was on the call with the 911 operator. Gutierrez also began issuing verbal commands for compliance directed at both Alex and Jessica. On information and belief, Alex's hearing and audio perception were severely impaired at the time because he had been shot in the head. On information and belief, Alex was unable to hear or understand Gutierrez's verbal identification as a police officer and Gutierrez's verbal commands because Alex's hearing and audio perception were impaired from having been shot in the head.

52.     During the entirety of Gutierrez's 911 call and before on-duty police officers arrived at the scene, Gutierrez made no attempt to render medical aid or provide any emergency physical care to either Alex or Jessica. Gutierrez failed to render aid even though he knew that he had just shot both Alex and Jessica at close range, causing them each to have severe and life-

threatening physical injuries.

53. As Gutierrez spoke to the 911 operator, on multiple occasions he turned his back to Alex and Jessica because he did not perceive either of them as presenting a threat to his physical safety. During the entirety of Gutierrez's 911 call and before on-duty police officers arrived at the scene, however, Gutierrez made no attempt to arrest or detain Alex or Jessica.

**C.  Officer Serrato Used Excessive Force When He Shot and Killed Alex Gonzales, Jr. Without Provocation or Justification.**

54. At approximately 12:37 a.m., on-duty APD Officer Luis Serrato ("Serrato") and his partner APD Officer Brian Nenno ("Nenno") responded to Gutierrez's 911 call and arrived at the scene.

55. Prior to their arrival at the scene, both Serrato and Nenno had been apprised by 911 dispatch that a person claiming to be an off-duty APD officer had shot the driver of another vehicle. However, upon arriving at the scene neither Serrato nor Nenno took any steps to verify that Gutierrez was in fact an APD police officer. On information and belief, neither Serrato nor Nenno recognized Gutierrez as an APD officer from past interactions with him.

56. Prior to their arrival at the scene, both Serrato and Nenno had reason to know of the possible presence of a baby at the scene. The 911 dispatch call notes from the event were available to both Serrato and Nenno before they arrived at the scene, and those call notes contained an entry prior to their arrival at the scene that stated: "fem is saying my baby my baby…unkn preg or child". However, neither Serrato nor Nenno took steps to determine if a baby was present at the scene after they arrived.

57. When Serrato and Nenno arrived at the scene, Alex remained standing outside his driver-side door and Jessica remained laying on the ground just outside the passenger door of Alex's vehicle. Serrato and Nenno immediately lined up in formation with Gutierrez, positioned

behind Gutierrez's unmarked personal vehicle for cover.

58.    Serrato and Nenno immediately joined Gutierrez in aiming their firearms at Alex as he struggled to maintain his balance outside the driver-door of his own vehicle. Serrato and Nenno each pointed his firearm at Alex even though they had not seen Alex holding a gun, had not been told that Alex was in possession of a gun, had no reason to think that Alex had fired a weapon, and had no reason to think that Alex posed a threat of harm to anyone at that time.

59.    Only *after* Serrato and Nenno had each pointed their respective gun at Alex did Gutierrez then state to Serrato and Nenno that Alex had pointed a gun at him (Gutierrez). Again, Gutierrez's statement was false when it was made because Alex had not pointed a gun at Gutierrez. Gutierrez also stated to Serrato and Nenno at that time that there was a gun in the driver's side of Alex's car.

60.    Almost immediately after arriving at the scene, Serrato and Nenno each knew that Gutierrez had shot both Alex and Jessica. Serrato and Nenno each could easily observe that both Alex and Jessica had suffered severe and life-threatening gunshot wounds.  Yest, neither Serrato nor Nenno attempted to render medical aid or assistance to Alex or Jessica upon arriving at the scene.

61.    Officer Nenno indicated to Gutierrez that Gutierrez should stand back from the officer's defensive position behind Gutierrez's car, and Gutierrez did so. Nenno and Serrato maintained their defensive position behind Gutierrez's car and continued to point their guns at Alex, who was still standing at the driver's door of his own car. Alex had his hands in plain sight and the officers could plainly see that Alex was not holding a weapon.

62.    Nenno and Serrato began shouting multiple, conflicting commands at Alex such as walk, turn around, stop, and keep walking in both English and Spanish.

63. On information and belief, Alex continued to suffer from impaired hearing and impaired auditory processing that prevented him from hearing and understanding the commands that Serrato and Nenno shouted at him. An experienced and trained law enforcement officer in the position of Serrato and Nenno at that time reasonably should have known that there was a high probability that Alex could not hear or understand their verbal commands at the time because he had been shot in the head and was severely injured and bleeding.

64. Alex began to walk slowly and stumble toward the rear of his car and then around to the passenger side of the car. At all times, Alex's movements remained slow and lumbering. He never made any sudden or unexpected movements. Alex's hands remained visible at all times. Serrato and Nenno could both see that Alex had no weapon in his hands.

65. When Alex reached the passenger side of his car, he glanced down to see his girlfriend Jessica laying on the ground bleeding.

66. While Alex was struggling and staggering to reach the passenger side of the car to check on the welfare of Jessica and Z.A.G., Serrato unnecessarily and without reason abandoned his position of cover behind Gutierrez's vehicle and walked several steps to his right—into the open and away from any cover. Serrato stood completely upright, presenting his full body as a target for potential gunfire.

67. No reasonable officer in Serrato's position would have left cover to expose himself in the open if he believed Alex or his wounded passenger (Jessica) posed an imminent threat of harm to him in those circumstances. During this sequence of events, Nenno maintained his position of cover behind Gutierrez's vehicle at all times.

68. Serrato moved into the open to have a clear line of fire at Alex, as Alex stood next to the rear car door just inches from baby Z.A.G. Serrato kept his gun trained on Alex at all times.

On information and belief, Serrato had already decided at the time he abandoned his position of cover that he would use lethal force on Alex if Alex made any small movement with his hand toward the inside of the car.

69.     Serrato continued to observe that Alex's hands were empty, and that Alex did not possess or have access to a weapon.

70.     Serrato yelled at Alex several times "Don't reach! Don't reach!" On information and belief, Serrato had already determined that he was going to use lethal force on Alex if Alex made any slight reaching move into the car.

71.     Not knowing whether his baby Z.A.G. had been shot, Alex slowly opened the rear passenger door to check on his infant son. As Alex bent down to look into the rear passenger door to check on baby Z.A.G., Alex kept his right hand visible and touching the open car door. Alex gently leaned below the roof line of the vehicle to look inside the car. Alex slowly made a small movement with his left hand toward the interior of the car where Z.A.G. was still secured in a child restraining seat. Alex continued to move slowly, and he made no sudden movements at all.

72.     As soon as Alex made even the slightest movement of his left hand into the vehicle, Serrato began rapidly firing his weapon at Alex. In that moment, Alex did not even begin to make any movement to withdraw his hand from the vehicle. Alex did nothing to indicate to Serrato that he presented a threat of harm to anyone in that moment. Serrato did not see Alex in possession of a weapon, and Serrato had no reason to believe that Alex might be able to access a gun or weapon in the right rear seat of Alex's car.

73.     Serrato fired at least ten shots at Alex, hitting him multiple times.

74.     Serrato's barrage of gunfire further inflicted immediate and serious physical injuries on Alex. Alex slumped to the ground lifeless and dying, just inches away from his infant

16

son Z.A.G. Alex would later die on-scene as a result of his multiple gunshot wounds.

75. Serrato used lethal force on Alex without provocation or justification. At no time did Serrato observe Alex do anything to give Serrato a reasonable belief that Alex posed a risk of immediate physical danger to Serrato or anyone else. Serrato had no other reason or information to believe that Alex posed an immediate risk of physical danger to Serrato or anyone. Serrato knew that Alex himself had already been shot in the head. Serrato observed Alex making slow and lumbering movements at all times, and never making a surprise movement. No reasonable officer would have chosen to use lethal force on Alex give the lack of an immediate threat to anyone's safety.

76. No reasonable officer in Serrato's position that night would have increased his own risk of danger and/or escalated the situation by abandoning a position of cover in the way that Serrato did. Serrato himself was responsible for creating any risk of danger or perceived risk of danger that Serrato claims to have faced in the moment he chose to use lethal force.

77. Serrato showed no concern for the safety of bystanders when he decided to use lethal force. Serrato knew that Jessica, laying on the ground and severely bleeding from gunshot wounds, was in his line of fire and was at risk of Serrato shooting her if Serrato decided to fire at Alex. Serrato also knew or should have known that a baby may be present at the scene and was at risk of being shot if Serrato chose to use lethal force. No reasonable officer in Serrato's position at the time would have chosen to use lethal force directed at Alex, given the substantial risk of serious physical injury to bystanders.

78. Serrato had reasonable alternatives available to him other than the use of lethal force. For example, Serrato could have maintained his position of cover and waited for additional law enforcement officers to arrive on scene. Serrato could have continued to observe Alex's

actions and could have waited to see if Alex ever did anything to indicate that Alex presented a risk of physical injury to anyone. If Serrato had simply kept his cool and waited, he would have seen Alex check on Z.A.G. and would have realized that there was a baby in the car. Serrato could have pursued other methods of de-escalation. No reasonable officer under the circumstances would have chosen to use lethal force on Alex as Serrato did in that moment, given the available alternatives to the use of lethal force.

## IV.    ASSERTED CLAIMS AND CAUSES OF ACTION

**A.    Claim No. 1: Against Defendant Gutierrez Pursuant to 42 U.S.C. §1983 for Violation of Alex Gonzales, Jr.'s Right to be Free of Excessive Force Protected By The Fourth and Fourteenth Amendments to the U.S. Constitution.**

79.    Each Plaintiff asserts this claim and cause of action against Defendant Gabriel Gutierrez pursuant to 42 U.S.C. §1983. Each Plaintiff asserts his or her own individual cause of action under §1983 as a wrongful death beneficiary of Alex Gonzales, Jr. under Texas law pursuant to Tex. Civ. Pr. & Rem. Code §71.004(b). Each Plaintiff also asserts Z.A.G.'s cause of action under §1983 as a wrongful death beneficiary and as "Next Friend" of Z.A.G. under Tex. Civ. Pr. & Rem. Code §71.004(b). Plaintiffs incorporate by reference all allegations asserted in Sections I – III, *supra.*

80.    Even though Defendant Gutierrez was "off-duty" at the time he initially encountered Alex, all of Gutierrez's relevant interactions with Alex (including shooting Alex) were undertaken under color of law. The APD General Orders in effect on January 5, 2021[2] expressly permitted off-duty officers to take law enforcement actions while off-duty.[3] The APD General Orders at the time also expressly authorized off-duty officers to carry a firearm while off-

---

[2] On information and belief, the APD General Orders in effect on January 5, 2021, were the APD General Orders issued on November 12, 2020.

[3] *See generally*, Austin Police Department General Orders Issued November 12, 2020 at §364.

duty as "a law enforcement officer as authorized by this order . . . ."[4] The APD General Orders at the time required that, when an off-duty officer decides to intervene and take a law enforcement action, the officer "should clearly identify himself as a police officer to those involved in the situation, if practicable."[5] Under the authority granted to him by the APD General Orders as an off-duty officer, Gutierrez made a decision to intervene with respect to Alex and the other passengers in Alex's vehicle, and Gutierrez undertook law enforcement actions with respect to Alex, including but not limited to using lethal force and shooting Alex. After he shot Alex, Gutierrez can be heard on the 911 call recording shouting at Alex in an attempt to identify himself as an Austin police officer. Gutierrez also can be heard on the 911 call recording continuing to take law enforcement actions with respect to Alex by shouting verbal commands for compliance.

81.     No reasonable police officer would have made the same decision to use lethal force that Gutierrez made, given the totality of the circumstances—including but not limited to the fact that Gutierrez was off-duty, Gutierrez's current physical and mental condition, the fact that Gutierrez was responsible for creating and escalating the "road rage" encounter with Alex and Jessica, the fact that neither Alex nor Jessica presented a threat of physical harm to Gutierrez or anyone, the fact that Gutierrez had not witnessed the commission of a crime or a crime-in-progress, the fact that the use of lethal force presented a substantial risk of physical harm or death to innocent bystanders, the fact that Gutierrez had not identified himself as a police officer, the fact that Gutierrez had reasonable alternatives to the use of lethal force available to him, and the fact that Gutierrez had reasonable de-escalation techniques available to him.

82.     Gutierrez's use of lethal force against Alex Gonzales, Jr. on January 5, 2021

---

[4] *See Id.* at §364.3(a).
[5] *See Id.* at §364.4.1(b).

amounted to excessive force in violation of Alex's rights under the Fourth and Fourteenth Amendments to the United States Constitution. The amount and degree of force used by Gutierrez was unnecessary and clearly excessive to any law enforcement objective or other need at the time.

83.     Gutierrez is not entitled to qualified immunity for his use of excessive force against Alex Gonzales, Jr. The use of lethal force and excessive force by Gutierrez was in violation of clearly established law. Gutierrez's use of lethal force and excessive force was so egregious and unlawful that no reasonable officer would have made the same decision to use lethal force under the totality of the circumstances.

84.     Gutierrez's use of unconstitutional excessive force against Alex Gonzales, Jr. was a direct and proximate cause of substantial injuries to Alex Gonzales, Jr., including Alex's death.

85.     Plaintiff Alex Gonzales, Sr., Plaintiff Elizabeth Herrera, and minor child Z.A.G. each have suffered compensable damages, as described in more detail below, as a result of the wrongful death of Alex Gonzales, Jr. caused by the wrongful actions and excessive force of Defendant Gutierrez.

86.     Gutierrez used lethal force toward Alex Gonzales, Jr. with a reckless and callous indifference to Alex's constitutional rights under the Fourth and Fourteen Amendments to be free from use of excessive force by the police. As such, each Plaintiff is entitled to an award of exemplary or punitive damages in an amount to be determined by a civil jury at trial.

**B.      Claim No. 2: Against Defendant Serrato Pursuant to 42 U.S.C. §1983 for Violation of Alex Gonzales, Jr.'s Right to be Free of Excessive Force Protected By The Fourth and Fourteenth Amendments to the U.S. Constitution.**

87.     Each Plaintiff asserts this claim and cause of action against Defendant Luis Serrato pursuant to 42 U.S.C. §1983. Each Plaintiff asserts his or her own individual cause of action under §1983 as a wrongful death beneficiary of Alex Gonzales, Jr. under Texas law pursuant to Tex. Civ.

Pr. & Rem. Code §71.004(b). Each Plaintiff also asserts Z.A.G.'s cause of action under §1983 as a wrongful death beneficiary and as "Next Friend" of Z.A.G. under Tex. Civ. Pr. & Rem. Code §71.004(b). Plaintiffs incorporate by reference all allegations asserted in Sections I – III, *supra*.

88.     Defendant Serrato was an on-duty Austin police officer at the time he responded to the scene of Alex's shooting after Gutierrez called 911. Serrato's actions with respect to Alex (including shooting Alex) were undertaken under color of law.

89.     No reasonable police officer would have made the same decision to use lethal force directed at Alex that Serrato made, given the totality of the circumstances—including but not limited to the fact that Alex was not in possession of a weapon and did not have immediate access to a weapon, the fact that Alex never did anything to indicate he posed a risk of physical harm to anyone, the fact that Alex had been visibly shot in the head, the fact that Alex was likely to be suffering from impaired hearing and/or audio processing, the fact that Alex could be seen making only slow and lumbering movements without any sudden or unexpected movements, the fact that the use of lethal force presented the risk of serious physical injury or death to bystanders, the fact that Serrato had increased his own risk of danger and escalated the situation by unreasonably abandoning his position of cover, and the fact that Serrato had reasonable de-escalation techniques and reasonable alternatives to the use of lethal force available to him.

90.     Serrato's use of lethal force against Alex Gonzales, Jr. on January 5, 2021 amounted to excessive force in violation of Alex's rights under the Fourth and Fourteenth Amendments to the United States Constitution. The amount and degree of force used by Serrato was unnecessary and clearly excessive to any law enforcement objective or other need at the time.

91.     Serrato is not entitled to qualified immunity for his use of excessive force against Alex Gonzales, Jr. The use of lethal force and excessive force by Serrato was in violation of clearly

established law. Serrato's use of lethal force and excessive force was so egregious and unlawful that no reasonable officer would have made the same decision to use lethal force under the totality of the circumstances.

92.     Serrato's use of unconstitutional excessive force against Alex Gonzales, Jr. was a direct and proximate cause of substantial injuries to Alex Gonzales, Jr., including Alex's death.

93.     Plaintiff Alex Gonzales, Sr., Plaintiff Elizabeth Herrera, and minor child Z.A.G. each have suffered compensable damages, as described in more detail below, as a result of the wrongful death of Alex Gonzales, Jr. caused by the wrongful actions and excessive force of Defendant Serrato.

94.     Serrato used lethal force toward Alex Gonzales, Jr. with a reckless and callous indifference to Alex's constitutional rights under the Fourth and Fourteen Amendments to be free from use of excessive force by the police. As such, each Plaintiff is entitled to an award of exemplary or punitive damages in an amount to be determined by a civil jury at trial.

## V.     DAMAGES

95.     Alex Gonzales, Jr. was a happy, loving man who adored his parents, who cherished his newborn son, and who embraced his new role as a father to Z.A.G. Alex's tragic and unnecessary death at the hands of police violence, acting in violation of Alex's constitutional rights, caused severe and permanent damages, including Alex's death.

96.     Plaintiff Alex Gonzales, Sr. and Plaintiff Elizabeth Herrera each seek to recover the following categories of damages in their respective capacity as wrongful death beneficiaries of Alex, pursuant to Texas Civil Practice and Remedies Code §71.004(b):

> a.  Mental anguish damages (past and future) for the emotional pain, torment and suffering each Plaintiff has experienced and will continue to experience because of

the death of their son;

b. Physical pain and suffering (past and future) each Plaintiff has experienced and will continue to experience because of the death of their son;

c. Loss of companionship and society damages (past and future) for the loss of positive benefits flowing from the love, comfort, companionship, and society that each Plaintiff would have received from Alex had he lived; and

d. Pecuniary loss damages (past and future) for the loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of pecuniary value that each Plaintiff would have received from Alex had he lived.

97. In their capacity as "Next Friend" to Z.A.G., Plaintiffs seek to recover, on behalf of Z.A.G., the following categories of wrongful death damages suffered by Z.A.G. pursuant to Texas Civil Practice and Remedies Code §71.004(b):

a. Future lost wages, lost earning capacity, and loss of economic support from Alex Gonzales, Jr.;

b. Mental anguish damages (past and future) for the emotional pain, torment and suffering Z.A.G. has experienced and will continue to experience because of the death of Z.A.G.'s father Alex;

c. Physical pain and suffering (past and future) Z.A.G. has experienced and will continue to experience because of the death of Z.A.G.'s father Alex;

d. Loss of companionship and society damages (past and future) for the loss of positive benefits flowing from the love, comfort, companionship, and society that Z.A.G. would have received from his father Alex had he lived; and

e. Pecuniary loss damages (past and future) for the loss of care, maintenance, support,

services, advice, counsel, and reasonable contributions of pecuniary value that Z.A.G. would have received from Alex had he lived.

98.     Each Plaintiff seeks recovery of exemplary damages against each Defendant as a result of each Defendant's respective violation of Alex's constitutional rights that each Defendant undertook with a reckless and callous indifference to Alex's right to be free of excessive force from the police as protected by the Fourth and Fourteenth Amendments to the United States Constitution.

99.     Each Plaintiff (both individually and as "Next Friend" to Z.A.G.) further seeks to recover the following categories of damages:

    a.  Prejudgment and post-judgment interest;

    b.  Costs of court;

    c.  Reasonable and necessary attorneys' fees incurred by Plaintiffs through trial, along with reasonable and necessary attorneys' fees that may be incurred by Plaintiffs for any post-trial proceedings or appeal, pursuant to 42 U.S.C. §1988; and

    d.  Any further and additional relief to which Plaintiffs may be legally entitled.

## VI.     REQUEST FOR A JURY TRIAL

100.    Plaintiffs request a jury trial on all issues that legally may be tried to a jury.

## VII.     PRAYER FOR RELIEF

101.    Plaintiffs request that Defendant Gutierrez and Defendant Serrato each be summoned to appear and answer Plaintiffs' allegations. After a jury trial regarding the asserted claims and causes of action, Plaintiffs pray the court enter judgment in their favor on the asserted claim under 42 U.S.C. §1983, assess monetary damages for the injuries alleged above, and award any other further relief to which Plaintiffs are legally entitled.

Dated: March 30, 2023

Respectfully Submitted,

 /s/ Donald Puckett
Donald Puckett (Texas Bar No. 24013358)
Clifford Chad Henson (Texas Bar No. 24087711)
(*Application for admission forthcoming*)
**DEVLIN LAW FIRM LLC**
1526 Gilpin Ave.
Wilmington, DE 19806
Telephone: (302) 449-9010
dpuckett@devlinlawfirm.com
chenson@devlinlawfirm.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that March 30, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

 /s/ Donald Puckett
Donald Puckett